Argued October 3, affirmed November 14, 1922, rehearing denied
January 30, 1923.

# BRYANT v. DUKEHART.

(210 Pac. 454.)

**Witnesses—Privileged Communication to Attorney not Admissible, Although in Hands of a Third Person.**

1. Communications of client to attorney in the course of professional employment as to which, at common law and under Section 733, subdivision 2, Or. L., the attorney may not without the client's consent be examined, are privileged, so that neither may the client be compelled to disclose them, nor may they be admitted in evidence, though in the form of a letter to the attorney, and though the letter has got into the hands of a third person, and this regardless of how it got there.

**Witnesses—Privilege of Communication to Wife not Destroyed by Her Divorce or Death.**

2. The privilege which communications from husband to wife during marriage have under Section 733, Or. L., declaring that without his consent she shall not be examined as to them during marriage or afterwards, prevents his being compelled to disclose them, though she has not only secured a divorce but has died.

**Witnesses — Privileged Communication to Wife not Admissible Against Husband on Habeas Corpus by Him Against Child's Guardian.**

3. *Habeas corpus* by husband for possession of child against one appointed its guardian on death of the mother after her divorce, not being a civil proceeding between the spouses, communications from husband to wife during the marriage are not within any exception to their privilege under Section 733, subdivision 1, Or. L.

**Witnesses—Limitation on Consent to Wife or Attorney Testifying to Communication from Husband or Client Testifying Stated.**

4. The consent to wife or attorney being examined on the same subject within Section 733, subdivisions 1, 2, Or. L., which Section 734 provides shall be deemed given by a party offering himself as witness, is limited to the subjects to which he himself on direct examination had testified.

**Witnesses—Party not Testifying on Direct to Communication to Wife or Attorney Need not on Cross.**

5. On cross-examination of a party, as to which Section 734, Or. L., has no application, he cannot be compelled to divulge confidential communications to wife or attorney as to which he did not testify on his direct examination.

---

2. Separation of husband and wife as affecting privilege of communication between them, see notes in Ann. Cas. 1912B, 1200; Ann. Cas. 1918E, 193; L. R. A. 1916B, 1275.

Appeal and Error—When Error in Admitting Evidence in Case Tried to Court Considered Harmless Stated.

6. In a case tried without a jury, error in admitting confidential communications of plaintiff to wife and attorney will not be regarded as prejudicial, if, disregarding them, the appellate court is satisfied from other competent evidence that the judgment should be affirmed.

Habeas Corpus — Under Facts as to Residence and Separation of Husband and Wife, Rights to Custody of Child Held not Controlled by Law of Other State.

7. The law of California in no way controls the rights of the parties in *habeas corpus* for custody of plaintiff's child, though he and his wife resided there while they were living together, and when the child was born she, for fault of his, giving her sufficient legal reason, having left him, taking the child, and established an independent domicile for herself and child in Oregon, where she remained till her death, and where the child still remains.

Habeas Corpus — Intent of Husband to Evade Responsibility and Duty to Child Shown by Separation Agreement.

8. By terms of separation agreement, though it made some provision for support of the wife and child, *held* that the husband intended to voluntarily relinquish his right to custody and control of the child, and to renounce his parental authority over it, and to evade and relieve himself from all responsibility and duty to it.

Divorce—On Death of Parent Awarded Custody of Child, Right of Survivor is Unaffected by Decree.

9. Decree in divorce awarding custody of the child to the mother does not affect the father's right to custody on her death; but, as a general rule, on such death the other parent is entitled to the custody.

Habeas Corpus—Under Statute Right of Parents to Custody Equal.

10. The common-law rule that the rights of the father to the custody and control of minor children are superior to those of the mother is abrogated by Section 9765, Or. L., whereby the rights of the parents in that respect, in the absence of misconduct, are equal.

Guardian and Ward—Effect on Parent's Right of Custody by Appointment of Guardian of Child Stated.

11. Notwithstanding the appointment by the court of a guardian for a minor, the father, if living and competent to transact his own business, is by Section 1314, Or. L., defining and limiting the

7. Conflict of laws as to custody of children after divorce, see note in 12 Ann. Cas. 1059.

9. Effect of death of parent to whom custody of child was awarded by divorce decree upon rights of surviving parent, see notes in 21 Ann. Cas. 466; Ann. Cas. 1915C, 653; 20 L. R. A. (N. S.) 171.

On effect of provision in decree of divorce or separation on right of parent to custody of child, see note in 41 L. R. A. (N. S.) 597.

rights, powers, ·and duties of such guardian, entitled to the custody of the person of the minor and to the care of its education.

**Guardian and Ward—Effect on Father's Right of Custody of Child by Mother's Appointment of Testamentary Guardian Stated.**

12. By provision of Section 1316, Or. L., the appointment, thereby authorized, of a guardian for a minor by will of the mother, who has by decree of divorce been awarded custody of the child, does not deprive the surviving father, if competent to transact his own business, of its custody. ·

**Habeas Corpus—Surviving Parent Entitled to Custody Unless Shown Unfit or Unable.**

13. In the absence of unfitness or inability of a parent to properly care for his minor child, which must be shown by one objecting, he is entitled to its custody, the mother being dead.

**Habeas Corpus—In View of Prior Immoral Conduct, Father Denied Custody of Child, in Absence of Showing of Present Character.**

14. In view of shown previous immoral conduct of the father, now having no home of his own, but living with aunts and uncle, and his abandonment of claim to custody of his child, and his delay in seeking to regain it, *held* that, in the absence of clear and satisfactory proof, not only of his present moral character but of settled habits that would afford a good example for his minor child, he should not be awarded its custody now, where left by the deceased mother with her sister, well fitted and able to properly care for the child.

From Multnomah: W. N. GATENS, Judge.

Department 1.

AFFIRMED.    REHEARING DENIED.

For appellant there was a brief and oral arguments by *Mr. Arthur I. Moulton* and *Mr. Walter Christie.*

For respondent there was a brief over the names of *Messrs. Platt & Platt, Montgomery & Fales,* with an oral argument by *Mr. Hugh Montgomery.*

RAND, J.—Plaintiff, a resident of Oakland, California, by *habeas corpus* proceedings, seeks to recover the custody of John Dukehart Bryant, his son, now of the age of nine years and four months. The child is now at Portland, Oregon, in the custody of the defendant, a sister of its deceased mother. Mrs.

Bryant, the mother of the child, died on March 19, 1919. The parents of the child were married at Portland, Oregon, in 1910, and immediately thereafter they removed to Oakland, California, where the child was born on June 11, 1913. Immediately following the birth of the child the parents separated and never thereafter lived together as husband and wife. Their separation was caused by plaintiff's improper conduct with other women. After their separation, the plaintiff commenced suit for divorce in the State of California, and Walter Christie, an attorney of that state, represented him in that suit.

1. The plaintiff, on July 21, 1913, wrote a letter to Christie stating that under an assumed name he was then living at Los Angeles, California, with another woman as husband and wife. Upon the trial the plaintiff offered himself as a witness in his own behalf, but, on direct examination, he did not testify to anything having any bearing upon the subject matter of the letter. Upon cross-examination he was interrogated, over his objection and exception, as to the contents of the letter and the letter was offered and received in evidence. The ground of the objection was that the letter, being a confidential communication between the plaintiff and his attorney in the course of professional employment, was incompetent and inadmissible, and that defendant's cross-examination of plaintiff upon the matters therein disclosed was also improper and incompetent.

All confidential communications, whether oral or written, made to an attorney in the course of professional employment, are privileged, even though no suit or action had been begun or was in contemplation at the time. Whenever the relation of attorney and client exists, all communications made in confidence

by one to the other, which by any possibility may become the subject of judicial inquiry, are privileged and inadmissible as evidence unless such privilege is waived by the client. Without the consent of the client, the attorney will not be permitted to disclose what such communications are nor can the client himself be compelled to disclose the same. In *State* v. *White,* 19 Kan. 445 (27 Am. Rep. 137), the court said: "It would be absurd to protect by legislative enactment professional communications, and to leave them unprotected at the examination of the client. In such an event, in all civil actions, the confidential statements of client and counsel would be exposed, and likewise the same would occur in all criminal actions where the defendant should testify. The authorities are otherwise. The true view seems to be that communications, which the lawyer is precluded from disclosing, the client cannot be compelled to disclose. This privilege is essential to public justice, for did it not exist no man would dare to consult a professional adviser with a view to his defense, or to the enforcement of his rights." This rule applies to written communications in the possession of third parties as fully as it does to those in the possession of the attorney, and this is so regardless of how such communications may have come into the possession of the party seeking to use them as evidence. The right conferred upon the client is for his protection and advantage and it is one which he alone is authorized to waive. Therefore the letter in question did not lose its privileged character and become competent evidence against the plaintiff simply because it had passed from the possession of his counsel, to whom it was written, and into the hands of a third party, regardless of how such change of

possession may have occurred: See 4 Jones' Blue Book of Evi., § 751. This was the rule at common law and it is preserved by our statute, Section 733, Or. L., which provides:

"There are particular relations in which it is the policy of the law to encourage confidence, and to preserve it inviolate; therefore a person cannot be examined as a witness in the following cases:

"1. A husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either, during the marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but the exception does not apply to a civil action, suit, or proceeding, by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other;

"2. An attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon, in the course of professional employment."

2. Over his objection and exception, plaintiff, on cross-examination, also was interrogated as to three letters written by him to his wife during the period of their marriage relations, one of which contains admissions of immoral conduct upon his part. These letters were clearly inadmissible. Those from the husband to the wife were confidential communications made during the marriage. If the wife had been living, except as provided in subdivision 1 above quoted, she would not have been permitted, without her husband's consent, to testify as to any admission or statement made by him to her. The fact that, since these letters were written, she secured a divorce from her husband or the fact that she has since died, does not affect the rule. Neither the death nor di-

vorce of one spouse, nor both of these things combined, removes the prohibition by which the law prevents the disclosure of confidential communications made to such spouse by the other during marriage. To the rule that such confidential communications between the husband and wife are privileged and cannot be divulged without the consent of the party making them "there are," says Mr. Greenleaf, "no exceptions," in 1 Greenleaf on Evi., Section 333.

3. As this was not "a civil action, suit or proceeding by one (the wife and husband) against the other or a criminal action or proceeding for a crime committed by one against the other," these letters came within the prohibition of subdivision 1, Section 733, aforesaid.

4. It is contended that by virtue of the provisions of Section 734, Or. L., the plaintiff, by offering himself as a witness in this cause, consented to his examination upon the contents of the letters written to Christie and to his wife and that by so testifying he waived the right to object to the disclosure of the contents of these communications. Section 734, Or. L., reads as follows: "If a party to the action, suit or proceeding, offer himself as a witness, that is to be deemed a consent to the examination also of a wife, husband, attorney, clergyman, physician, or surgeon, on the same subject, within the meaning of subdivisions 1, 2, 3 and 4 of the last section." Under the provisions of this section, the plaintiff, by offering himself as a witness, consented to the examination of his attorney, and, if she had been living, he would have consented to the examination of his wife upon all subjects concerning which he himself, on direct examination, had testified; but such consent was limited to such subjects only as he himself on direct

examination had testified to. Section 734 has no application to the cross-examination of a party to a suit of action. It refers only to the examination of an attorney, husband or wife, or the like, of the party to the action. This is manifest from the plain provisions and language of the statute.

5. Whenever a party to any judicial proceeding offers himself as a witness and testifies upon any subject, it does not require the aid of Section 734, Or. L., to authorize his cross-examination upon the subjects to which he testified on direct examination. The general rule is, and the statute is merely declaratory of it, that if a party "gives evidence in his own behalf, he cannot, on cross-examination, be compelled to divulge statements made by him during a confidential consultation between himself and his attorney, and as to which he did not testify on his direct examination." 4 Jones' Blue Book of Evi., § 756, and authorities there cited.

6. As these letters were incompetent and inadmissible, defendant's cross-examination upon the statements and admissions contained in the letters, was improper, and the introduction in evidence of the letters themselves was erroneous. But as this cause was tried by the court without the intervention of a jury, the error of the court in the admission of the letters and in permitting the plaintiff to be cross-examined thereon, cannot be prejudicial to the plaintiff, if, after the letters and testimony developed upon such cross-examination have been wholly disregarded, we are satisfied from other evidence which is competent, that the decision of the lower court should be affirmed.

7. Plaintiff contends that because he and his wife resided in California during the time they were

living together as husband and wife, and the child was born there, his right to the custody of the child in these proceedings is to be determined by the law of the State of California.

It appears that immediately following their marriage, the parents of the child removed to California, where they resided until after the birth of the child. The matrimonial domicile of the parties, was, therefore, in the State of California. As long as the marriage relations between them remained unbroken the domicile of the wife followed that of the husband. When, however, through the fault of the husband, a separation of the parties took place, then the domicile of the injured wife no longer followed that of the husband and she was at liberty to establish a separate domicile for herself: 1 Wharton on Conflict of Laws (3 ed.), §§ 46-A, 224. Independent of any admissions contained in the letters or any testimony developed by the cross-examination of plaintiff upon the contents of said letters, the plaintiff admitted that he had sustained improper relations with other women at the time he was living with his wife at Oakland, California, and that this was the cause of their separation. It thus appears from his own testimony that the marriage relations between himself and the mother of the child were broken through his own fault and that his wife had a sufficient legal reason for leaving him and taking her infant child away from his home. Thus, through the fault of the plaintiff, she had the right to and did, in fact, establish an independent domicile for herself and child at Portland, Oregon, where she remained up to the time of her death and where the child remains up to the present time. Therefore the law of the State of

California is not in any way controlling upon the rights of the parties to this proceeding.

8. In his petition for the writ plaintiff alleges that on account of certain difficulties that had arisen between himself and wife, an agreement was entered into between them whereby the child was temporarily left in the care and custody of his wife, but that he reserved the right to exercise supervision over the child. He also alleges that shortly after the agreement was entered into, without his knowledge or consent, his wife removed herself and child to Portland, Oregon, where she afterwards resided, with the child, until her death. In support of this issue plaintiff produced a duly certified copy of an agreement dated March 26, 1914, signed by himself and wife, in which, after reciting that said parties "are husband and wife but are not residing with each other and do not contemplate doing so," it provides that the wife shall "have the custody, control and care of the minor child," and that she shall "provide for its care and support," and that he "shall not be called upon to, in any manner, satisfy any of the past or existing obligations made by" her, and "shall not be responsible for any obligations which" she "may make in the future, whether the same be for necessaries or otherwise." It also provides that she "forever waives and surrenders any right she may have to call upon" him "for support or maintenance of herself and minor child." Under the terms of this contract the wife was given title to two parcels of encumbered real estate in Oakland, California, and there was assigned and subsequently paid to her a three thousand dollar interest in an indebtedness secured by a mortgage upon real property in Seattle, Washington.

By the terms of this contract, to which, by its exe-
cution, he assented, we think that he intended to
voluntarily relinquish his right to the custody and
control of his child and to renounce all parental
authority over it. It is manifest that he sought to
evade all the parental duties and responsibilities he
owed to his infant child. The fact that at the time
he made some provision for the support of the mother
and child is unimportant. The important fact is that
he undertook to relieve himself from all responsibility
and duty to the child.

9. It appears that Mrs. Bryant commenced a suit
for divorce in the Circuit Court for Multnomah
County, Oregon; that personal service was made
upon the plaintiff herein within this state; that the
child, at the time, was within this state and subject
to the jurisdiction of its courts; that a decree of
divorce in favor of Mrs. Bryant was rendered on
January 3, 1919, and that the custody of the child
was awarded by the decree to its mother. It also ap-
pears that the defendant, Sara Dukehart, was by
order of the County Court for Multnomah County,
Oregon, upon the petition of the deceased mother,
duly appointed guardian of the person and estate of
the child, and that the child, at the time of such
appointment, was within Multnomah County, Oregon.
It further appears that by the last will and testament
of the deceased mother she appointed the defendant,
together with her brother, as testamentary guardians
of said child. It is contended that because of these
proceedings plaintiff has been deprived of his right
to the custody of the child. The mother of the child
now being dead, the decree in the divorce suit cannot
in any way affect plaintiff's right to have the custody
of the child. It merely awarded the custody to the

106 Or.—24

mother and imposed upon her a personal trust revocable by the court rendering the decree upon proper showing. This trust has been terminated by her death: *Taylor* v. *Jeter,* 33 Ga. 195 (81 Am. Dec. 202). As a general rule, upon the death of the parent to whom is awarded the custody of a minor child by a decree divorcing the parents, the other parent becomes entitled to its custody. This is said to be almost a universal rule: *Matter of Allen,* 162 Cal. 625 (124 Pac. 237); *Schammel* v. *Schammel,* 105 Cal. 258 (38 Pac. 729); *Taylor* v. *Jeter,* 33 Ga. 195 (81 Am. Dec. 202).

10. At common law, the father, as against the mother and all other persons, was entitled to the custody of his minor children, unless he was a man of grossly immoral character or was unable to provide for them or had been guilty of such cruelty or neglect as to forfeit his right to the custody: *Jackson* v. *Jackson,* 8 Or. 402. The rule at common law that the father, to the exclusion of the mother, was entitled to the custody and control of the minor children, was based upon the common-law doctrine that the husband and wife were a legal unit and that the rights of the husband and wife were exercised by the husband alone. Consequently, as said in 20 R. C. L., page 596, while the marriage relation was unbroken "he was the sole guardian and in effect the sole legal parent of the minor children of the marriage. In him was vested their legal custody, he selected and established their place of residence, their citizenship and domicile followed his."

In this state the common-law rule, that the rights of the father to the custody and control of the minor children are superior to those of the mother, is abrogated by statute. In the absence of misconduct,

under Section 9765, Or. L., the rights of the parents to the custody and control of the minor children of the marriage are equal. As the right of Mrs. Bryant to the custody and control of the child, under the powers conferred upon her by the decree, terminated upon her death, the plaintiff, as the father of the child, is vested with the paramount right to its custody, unless the appointment of the defendant as guardian of the person and estate of the child by the County Court of Multnomah County, Oregon, or her appointment as testamentary guardian of the child by the last will of its mother, deprives the plaintiff of his right or by his own acts and misconduct the plaintiff has forfeited his parental rights.

11. Defendant's rights, powers and duties, as guardian of the child, are limited and defined by the statute under which she was appointed and this statute, Section 1314, provides that the father, if living and competent to transact his own business "shall be entitled to the custody of the person of the minor and to the care of his education." As he is living and is competent to transact his own business, his rights are superior to those of the defendant so far as her rights depend upon her appointment as guardian of the child.

12. The appointment of a testamentary guardian is purely statutory and our statute, Section 1316, empowers the mother, by her last will, to appoint a testamentary guardian for her minor child whenever by decree of divorce between her and the father of the child the custody has been awarded to her, but this section also provides that nothing contained therein shall be construed to deprive the surviving father of the custody of his children upon the death of the mother, he being competent to transact his

own business. Hence, unless the plaintiff, by his own misconduct, has forfeited his right to the custody of this child, the defendant's rights must yield to the superior and paramount rights of the father.

13. This leads to a consideration of what are the rights of a parent to the custody and control of his children. Both by statute and at common law the parents have a paramount right to the custody of their minor children. And where the right of the father to the custody of his child "is resisted, upon the ground of his unfitness for the trust, or other cause, a proper regard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs. * * The rights of the father on the one hand and the permanent interest and welfare of the infant on the other, are both to be regarded, but the right of the father is paramount, and should not be disregarded, except for grave cause. The breaking of the tie that binds them to each other can never be justified without the most solid and substantial reasons established by plain proof. In any form of proceeding, the sundering of such ties should always be approached by courts 'with great caution and with a deep sense of responsibility': *State* v. *Richardson,* 40 N. H. 274, 275." *Miller* v. *Wallace,* 76 Ga. 479 (2 Am. St. Rep. 48). But, the right of the parent is not a right of property in the child nor an absolute vested right to his custody. "It is an entire mistake," said Judge Story, in *United States* v. *Green,* 3 Mason, 382 (Fed. Cas. No. 15,256), "to suppose that the court is bound to deliver over the infant to its father, or that the latter has an absolute vested right in the custody." However, it is only in extreme cases of gross misconduct, inability, un-

fitness, neglect or cruelty upon the part of the parents, that the court would be justified in taking the custody and control of the children from the parents. But as said in 20 R. C. L., at page 599, ''If a father is found to be unfit in his character or mode of living to have the custody of his child and to control its associations and upbringing, the court has power in its discretion to disregard his paternal right and to appoint, if necessary, some other person suitable to have the custody of the child.'' Again, in Schouler's Domestic Relations (5 ed.), Section 248, the author says: ''The settled rule with us is that, while the court is bound to free the person from illegal restraint, it is not bound to decide who is entitled to the guardianship, or to deliver infants to the custody of any particular person; but this may be done whenever deemed proper. In other words, it is in the sound discretion of the court to alter the custody of the infants, or not.'' The parents ''are entitled to the custody of their minor children, except when they are unsuitable persons to be intrusted with their care, control and education, or when some exceptional circumstances appear which render such custody inimical to the best interests of the child.'' *Wilson* v. *Mitchell,* 48 Colo. 454, 466 (111 Pac. 21, 26, 30 L. R. A. (N. S.) 507). ''Unquestionably when the power of the court is invoked to place an infant into the custody of its parents and to withdraw such child from other persons, the court will scrutinize all the circumstances and ascertain 'if a change of custody would be disadvantageous to the infant.' If so, the change will not be made, 'and it matters not whether it is through the fault or the mere misfortune of the legal guardian that the infant has come to be out of his custody.' Hoch-

heimer's Custody of Infants, p. 29." *Wilson* v.
*Mitchell, supra. Prima facie* every father is en-
titled to the custody of his minor child as against
everyone but the child's mother, and as between
them their rights in this state, in the absence of mis-
conduct, are equal.

The burden of proof to show that the plaintiff
was not a fit person to have the custody and control
of this child was on the defendant. The plaintiff,
however, on direct examination, testified as follows:

"Q. What are your present habits with respect
to companionship and fitness to take care of the child?
"A. Very excellent, I believe. I live with my
aunt. At home every night. I never go any place
to speak of."

This question and answer opened up for cross-
examination the subject of plaintiff's fitness to have
the custody of the child and the defendant rightfully
availed herself of the opportunity to cross-examine
the plaintiff upon that question.

14. Plaintiff contends that if the admissions con-
tained in the letters above referred to and the testi-
mony developed by cross-examination on the matters
referred to in the letters are excluded, there is no evi-
dence in the case from which immoral conduct upon
his part and his fitness to have the custody of the
child, can be inferred. Independent of everything
appearing in the letters above referred to, it ap-
pears from plaintiff's own testimony, when con-
sidered in the light of the other testimony in the
case, that he was guilty of the grossest immoral con-
duct during the time he was sustaining marital rela-
tions with his wife. It also appears that after his
wife had discovered his misconduct he commenced a
trumped up suit for divorce in order to secure from

her the most advantageous settlement possible and that he made the contract above referred to in order to evade the responsibilities and duties which he owed to his wife and child. Following this he willfully deserted his wife and abandoned all claim upon his part to the custody and control of the child. It is true that at the time he was only twenty-four years of age, but youth affords no excuse for wife desertion or child abandonment. It also appears that one month and three days after the entry of the decree of divorce in favor of his first wife he married another woman in the State of California, and that he and his second wife are separated and that a suit for divorce is now pending between them. It also appears that it was only after his second marriage and separation that he made any effort to regain the custody of this child, although his first wife had been dead for more than two years. It further appears that he has no home of his own and that he is living with two aunts and an uncle at Oakland, California.

It is contended that the testimony of the immoral conduct of plaintiff was so remote that it can have no bearing on his present character. The testimony is remote but it has evidentiary value and there is no testimony offered to show that plaintiff has reformed.

Under the circumstances disclosed by the testimony, before a court would be entitled to award the custody of this child to him there should be clear and satisfactory proof, not only as to his present moral character, but also that his habits have become so settled that if the child was turned over to him his mode of living would be such as to afford a good example for the child to emulate.

The testimony discloses that the defendant is a woman of good character, that she is devoted to the welfare of the child, that prior to the death of the child's mother she took a considerable part in caring for the child and since the mother's death has had the entire care and responsibility of the child. She is employed in a bank and during the day has secured the services of a competent and respectable woman to take care of the child during her absence at the bank and the remainder of her time she has devoted entirely to looking after and properly caring for and educating this child. Under the testimony there is no question about her qualifications and fitness to have the child, nor is there any doubt but that the child will always be provided with a comfortable home and will be raised under proper surroundings.

For these reasons it would not be within the sound discretion of this court to take this child from the custody of the defendant and turn it over to the plaintiff. We are not at liberty, under the law, to experiment with this child's welfare. Therefore, although there is error in the record, there is, in our judgment, sufficient competent evidence which makes it our duty, reluctant as we are to interfere with the rights of the father, to affirm the judgment of the court below.

The judgment will therefore be affirmed, and it is so ordered.    AFFIRMED.

BURNETT, C. J., and McBRIDE and HARRIS, JJ., concur.